# **EXHIBIT A**

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 01-CF-1121

PATRICK HEWITT,
                            APPELLANT,
F-6766-00

v.

UNITED STATES,
                            APPELLEE.



FILED
JUL -1 2003
DISTRICT OF COLUMBIA
COURT OF APPEALS

Appeal from the Superior Court of the
District of Columbia
Criminal Division

(Hon. Russell F. Canan, Trial Judge)

(Argued June 10, 2003                                    Decided  July 1, 2003)

Before TERRY, SCHWELB, and RUIZ, *Associate Judges*.

### MEMORANDUM OPINION AND JUDGMENT

A jury convicted Patrick Hewitt of voluntary manslaughter while armed (VMWA), carrying a pistol without a license (CPWOL), possession of a firearm during a crime of violence (PFCV), and assault with a dangerous weapon (hammer) (ADW). The manslaughter and weapons convictions arose out of the shooting death of Hewitt's former girlfriend, Jacqueline Glover, on or about June 20, 1996. The ADW conviction involved an attack by Hewitt on Ms. Glover in the early morning hours of the same date. Because Hewitt spent the period from August or September 1996 to March 2000 in Great Britain, he was not tried until May 2001. On appeal, Hewitt presents several contentions for our consideration. Discerning no reversible error, we affirm.

### I.

Hewitt claims that the trial judge abused his discretion by admitting into evidence, as an excited utterance, a recording of a 911 call made by Ms. Glover in the early morning hours of June 20, 1996. The voices of both Ms. Glover and the defendant are heard on the tape-recording; Ms. Glover claimed that her boyfriend was attacking her with a hammer, while Glover denied that he was doing so.[1]

---

[1] Ms. Glover said, in pertinent part:

> He's hitting me. And I tried to get a hammer. And he hit me with the hammer. And he kicked me in my butt. And this is not the first time it happened.

Hewitt contends that Ms. Glover was obviously angry with Hewitt when she made the 911 call, and
(continued...)

2

The trial judge listened to the tape-recording, and he explained in some detail the reasons for his conclusion that Ms. Glover's statements on the tape constituted an excited utterance. The judge found that the declarant "sounds excited and nervous . . . to this [c]ourt"; that the call was made within a very short time of the assault with the hammer, a "clearly startling event[]"; and that the circumstances suggested "sincerity and spontaneity and not the fabrication [by] someone of such serious allegations." We cannot say that these findings were clearly erroneous or that the admission of the tape-recording constituted an abuse of discretion. *Malloy v. United States*, 797 A.2d 687, 689-90 (D.C. 2002).[2]

II

During the course of the prosecution case, the trial judge admitted a substantial amount of evidence of prior threats, assaults and abuse of Ms. Glover by Mr. Hewitt.[3] The trial judge granted the prosecution's pretrial motion *in limine* to introduce "other crimes" evidence, and he subsequently explained in meticulous detail why he had admitted the evidence. Substantially for the reasons stated on the record by the trial judge, we conclude that it was within his discretion to admit evidence of other unlawful acts by Hewitt vis-a-vis Ms. Glover in order to prove motive and identity. *See, e.g., Garibay v. United States*, 634 A.2d 946, 948 (D.C. 1993); *Mitchell v. United States*, 629 A.2d 10, 13 (D.C. 1993); *Hill v. United States*, 600 A.2d 58, 62 (D.C. 1991).[4]

On appeal, Hewitt argues for the first time that the judge abused his discretion by admitting "*so much* other crimes evidence." (Emphasis added.) But in this case, as in *Hill*, "while the admissibility of [other crimes] evidence . . . was sufficiently litigated throughout the trial, the separate issue of the redundancy and excessiveness of that evidence was never raised." 600 A.2d at 63. The trial judge, who gave extensive and thoughtful consideration to the issues presented to him, was never asked to, nor did he, pass on the issue of redundancy and excessiveness. There was no plain error. *Id.*

---

[1](...continued)
that her argument with Hewitt detracted from the reliability of her "excited utterance." Although we do not dismiss the logic of Hewitt's argument, we think it is unsupported by the trial judge's fact finding.

[2] A prosecution witness testified that a few days before her death, a crying and shaking Ms. Glover told him, following a heated telephone conversation with Hewitt, that Hewitt had threatened her with a handgun and had fired a shot at her but missed and hit the wall. The trial judge admitted this testimony on the ground that Ms. Glover's report was an excited utterance made very shortly after a startling event and that "Ms. Glover wasn't reflecting upon these matters or creating or fabricating . . . . [T]he circumstances in their totality reflect spontaneity and sincerity on the part of the declarant." Again, we perceive no abuse of discretion.

[3] The evidence of prior assaultive conduct is described in detail at pages 9-13 of the government's brief. We incorporate that description by reference.

[4] We note that the prosecutor focused on the prior abuse to some extent during his closing argument, but that the judge gave an appropriate limiting jury instruction.

3

### III.

On March 4, 2000, Hewitt flew into Newark International Airport from London Heathrow. Hewitt was in possession of a passport in the name of Glenn Goodwin, with Hewitt's photograph illegally substituted for that of Goodwin. Hewitt was taken to a secondary Immigration and Naturalization Service (INS) station at the Newark airport. He was then questioned about his identity and citizenship, the purpose of his visit, and other routine matters relating to his attempt to enter the United States. Hewitt signed a statement in which he claimed, *inter alia*, that he was Goodwin and that he had come to the United States to shop for baby clothes. Hewitt was also fingerprinted. The INS representatives denied Hewitt admission to the United States, and they placed him on a plane headed for London. While he was in the air, officials matched the fingerprints of the man to whom they had denied entry with those of Patrick Hewitt, who was wanted for murder in the District of Columbia. Hewitt was arrested upon arrival at Heathrow Airport. He was subsequently extradited to the United States and brought to trial.

The immigration officials did not read Hewitt his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and Hewitt made a pretrial motion to suppress the statement he made at the Newark Airport. The trial judge denied the motion, concluding that Hewitt was not "in custody" for *Miranda* purposes when he gave the statement. We agree. "The correct test for determining whether a person is in custody for Fifth Amendment purposes is whether the person is subject to the degree of restraint on freedom of movement . . . associated with a formal arrest." *Patton v. United States*, 633 A.2d 800, 815 n.7 (D.C. 1993) (per curiam). Although Hewitt was not free to leave,[5] this is not dispositive. *Id.* He was in a public waiting area throughout his detention, which lasted a total of three hours.[6] Hewitt was never placed under arrest or handcuffed, nor were any steps taken to file charges against him. Moreover, although it is true that the officers had probable cause to arrest Hewitt, this does not mean that he was in fact under arrest or in a form of custody equivalent to arrest. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). There was no error.

### IV.

Hewitt contends that the trial court erred in declining to suppress certain evidence, including a hammer, a shell casing, and a holster. These items were found in Hewitt's apartment during the investigation following Ms. Glover's death. We find no error. Briefly, the officers had the consent of at least one of the residents of the apartment; *see Villine v. United States*, 297 A.2d 785, 786 (D.C. 1972); the evidence was initially observed in plain view during a protective sweep of the murder scene; *cf. Mincey v. Arizona*, 437 U.S. 385, 393 (1979); and the evidence, although first seized prior to the issuance of a search warrant, would inevitably have been discovered during the execution of the warrant which a Superior Court judge signed soon thereafter. *See Nix v. Williams*, 467 U.S. 431, 448 (1984).

*Affirmed.*

---

[5] The false passport was not returned to Hewitt.

[6] The interview lasted forty minutes.

4

FOR THE COURT

*[signature]*

Garland Pinkston, Jr.
Clerk of the Court

Copies to:

Hon. Russell F. Canan

Clerk, Superior Court

Thomas T. Heslep, Esq.
419 7th Street, NW
Suite 401
Washington, DC 20004

John R. Fisher, Esq.
Asst. United States Attorney